IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


PRECISION CASTPARTS CORP.,      )
an Oregon corporation,          )
                                )
          Plaintiffs,           )   Case No. CV04-1699-HU
                                )
     vs.                        )      FINDINGS AND
                                )      RECOMMENDATION
HARTFORD ACCIDENT AND INDEMNITY )
COMPANY, ACE FIRE UNDERWRITERS  )
INSURANCE COMPANY, CENTURY INDEMNITY)
COMPANY, HIGHLANDS INSURANCE    )
COMPANY, and THE INSURANCE COMPANY )
OF THE STATE OF PENNSYLVANIA,   )
                                )
          Defendants.           )
_____)

Frank V. Langfitt
Daniel P. Larsen
Ater Wynne
222 S.W. Columbia, Suite 1800
Portland, Oregon 97201

Scott P. DeVries
Winston & Strawn


1  - FINDINGS AND RECOMMENDATION

101 California Street
San Francisco, California 94111
    Attorneys for plaintiffs

Thomas W. Brown
Thomas M. Christ
Cosgrave Vergeer Kester
805 S.E. Broadway, 8th Floor
Portland, Oregon

Carl E. Forsberg
Charles E. Albertson
Forsberg & Umlauf
900 Fourth Avenue, Suite 1700
Seattle, Washington
    Attorneys for defendant Hartford Accident and Indemnity

R. Lind Stapley
Soha & Lang
701 Fifth Avenue, Suite 2400
Seattle, Washington 98104

William G. Earle
Davis Rothwell Earle & Xochihua
1300 S.W. Fifth Avenue, Suite 1900
Portland, Oregon 97201
    Attorneys for defendants Ace Fire Underwriters Insurance
    Company, Century Indemnity Company, Highlands Insurance
    Company

Doug Tuffley
Thomas M. Jones
Jennifer C. Artiss
Cozen O'Connor 1201 Third Avenue, Suite 5200
Seattle, Washington 98101
    Attorneys for defendant The Insurance Company of the
    State of Pennsylvania

HUBEL, Magistrate Judge:

    This is an action by Precision Castparts Corporation (PCC)
against its liability insurers to recover defense and indemnity
costs associated with releases of thorium oxide into the sewer of
the City of Portland, and PCC's investigation and remediation

efforts. Defendant Hartford Accident and Indemnity (Hartford), joined by defendant Insurance Company of the State of Pennsylvania (ICSOP), moves for partial summary judgment on PCC's indemnity claim for the costs of the effluent pretreatment system constructed by PCC, on the grounds that 1) the cost of the pretreatment system is an ordinary cost of doing business, incurred to comply with a radioactive materials license issued by the State of Oregon and an industrial discharge permit issued by the City of Portland, rather than the cost of remediating damage to third party property; 2) coverage is not provided under the Hartford and ICSOP liability policies for the cost of preventing future property damage; and 3) the cost of a pretreatment system designed to prevent contamination from 1990 forward cannot be considered a cost incurred to remediate property damage which took place during Hartford's 1983-1985 policy periods or during ICSOP's 1977-78 policy periods.

PCC objects to some of the evidence filed by Hartford.

### Factual Background

PCC manufactures aircraft engine parts and airframe components. In the early 1970s, PCC developed an investment casting process for titanium parts that used thorium oxide, a low-level radioactive material regulated by the Nuclear Regulatory Commission through the Oregon Health Division (OHD). PCC first received a permit from OHD to possess and discharge

3   - FINDINGS AND RECOMMENDATION

thorium oxide into the Portland City sewer in 1970. From 1970 until 1982, in a building currently referred to as the Steel Facility, PCC used thorium oxide for investment casting, discharging thorium oxide into the PCC sewer and the City sewer.

In about 1982, PCC purchased a building adjacent to the Steel Facility and moved the operations and equipment from the Steel Facility into the new building, which became known as the Titanium Facility. All of the equipment moved from the Steel Facility to the Titanium Facility was probably contaminated with thorium because it had been used in the investment casting process for years at the Steel Facility, and had not been decontaminated before installation at the Titanium Facility.

PCC stopped using thorium oxide in its parts-casting process in approximately 1992.

PCC's storage and use of thorium oxide was regulated by a series of Radioactive Materials Licenses issued by OHD. The OHD licenses governed the amount of thorium oxide that could be stored on PCC's premises, identified Radiation Safety Officers responsible for overseeing the material, and established safety and health standards for the production workers who came into contact with the material. The City of Portland issued wastewater discharge permits that allowed discharges of thorium oxide, in compliance with applicable OHD regulations, into the City's sewers.

4    - FINDINGS AND RECOMMENDATION

In April 1989, OHD took sediment samples from the City sewer across the street from PCC to analyze for thorium oxide accumulation. Declaration of Martha Diblee ¶ 6. OHD learned that thorium oxide had accumulated in the sewer in the immediate area of discharge. Id. OHD's sampling was followed by a comprehensive survey done by PCC, the City, and OHD, which showed that PCC's industrial effluent containing thorium oxide had accumulated throughout the entire City sewer system. Id.

Before discovery of thorium oxide accumulations in the City sewers, PCC had never been issued a notice of noncompliance by OHD for discharging excess thorium oxide to the sewer, nor had PCC been requested to change its practices for discharging its industrial wastes containing thorium oxide to the City sewer. Id. at ¶ 7. OHD and PCC had assumed that discharges of thorium oxide were readily dispersible. Id.

On April 28, 1989, Martha Dibblee, Manager of Radioactive Materials Licensing for PCC, wrote a letter to Roy Marvin, PCC's Vice President, as follows:

> This letter is regarding sewer sediment samples collected on April 24, 1989. OAR 333-104-205 states in part that no licensee shall discharge radioactive material into a sanitary sewerage system unless it is readily soluble or dispersible in water. Contrary to the above, radioactive material has been discharged into the sewer which is not readily soluble or dispersible.
>                         * * *
> A written reply to this Item of Noncompliance must be submitted to this office within two (2) weeks of the

date of this letter. Within this time (by May 12, 1989) at least a temporary means to have all settleable radioactive material solids removed from your sewer discharge stream leading to sanitary or storm systems must be in place. In addition, a timeline must be submitted for a permanent solution for having no settleable radioactive material getting into sanitary or storm systems. After the two-week transition time line, you must also include in your written response a quality assurance analytical program to assure that the settleable solids have, indeed, been removed.

A plan and timeline developed in conjunction with the city of Portland and the Health Division must also be submitted for the necessary remedial actions for decontamination to acceptable levels of all sewer lines in which radioactive material may have accumulated. This plan should also be developed by May 12, 1989.

Declaration of Charles Albertson, Exhibit 9.

On May 5, 1989, Mr. Marvin received a letter from the City enclosing the City's official Notice of Violation issued to PCC in connection with its discharge of thorium oxide to the City's sewer. Id. at Exhibit 10. The letter required specific actions by PCC to address two general areas of concern on the part of the City: 1) precluding future discharges of radioactive settleable solids into the City's sewer system in accordance with PCC's OHD license; and 2) identifying as quickly as possible the "extent, volume and level of radioactive material in the sewer system and its discharge locations." Id.

In December 1989, PCC's management approved the expenditure of up to $43,000 to construct a filtration system for its sewer

6    - FINDINGS AND RECOMMENDATION

discharge. Id. at Exhibit 11. David Murray, PCC's Environmental Affairs Manager, described this filtration system at his deposition as "our first attempt at reducing the amount of thorium leaving the investing department in the wastewater." Exhibit 12, Albertson Declaration (Murray dep.) 59:6-25.

Discussions by PCC, OHD, and the City continued, resulting in the execution of a Consent Agreement on July 13, 1990. Albertson Declaration, Exhibit 13. The stated purpose of the Consent Agreement was to "resolv[e] certain issues regarding license conditions and performance standards with respect to discharges into the City sewer system." Id. The Consent Agreement stated further that the "mutual objectives of the parties are to implement activities that will result in eliminating Precision's discharges of thorium oxide to the City sewer system and cleanup of all areas where elevated concentrations of thorium oxide have been found..." Id. According to PCC, the Consent Agreement was intended to cause PCC to install a pretreatment system to eliminate thorium oxide discharges, prevent further damage to the City sewer by thorium oxide, and respond to thorium oxide concentration in City sewer lines. Declaration of David Murray, ¶¶ 11-19.

Ms. Dibblee states in a Declaration that the Consent Agreement was intended to "ensure that PCC's mitigation process precluded further discharge of thorium from the past and present

titanium casting processes to the sanitary sewer in industrial wastewater." Dibblee Declaration ¶ 8.

After the Consent Agreement was executed, PCC management approved funding for construction of an effluent pretreatment system for its sewer discharge.  The pretreatment system captured thorium oxide from PCC's Titanium Facility until production using thorium oxide was halted.

Hartford issued two policies to PCC that are at issue in this litigation: Policy No. 52 C HN6535 (effective May 1, 1983 to May 1, 1984) and Policy No. 52 UEN KB 3479 (effective May 1, 1984 to May 1, 1985). These policies provide, in pertinent part:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage ... to which this insurance applies caused by an occurrence...

See Albertson Declaration, Exhibit 22.

> "Property damage" is defined in the policy as [P]hysical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom...

ICSOP issued one policy at issue in this litigation, Umbrella Policy No. 4577-2124, which provides, in pertinent part:

> The Company hereby agrees ... to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability
>
> (a) Imposed upon the Assured by law, or
> (b) Assumed under contract or agreement

8   - FINDINGS AND RECOMMENDATION

>           by the Named Assured ...
>    for damages ... on account of:
>               * * *
>           (ii) Property damage
>    caused by or arising out of each occurrence ...

Tuffley Declaration, Exhibit A. "Property Damage" is defined as "loss of or direct damage to or destruction of tangible property." "Occurrence" is defined as:

>    continuous or repeated exposure to conditions which
>    unexpectedly and unintentionally results [sic] in
>    personal injury, property damage, or advertising
>    liability during the policy period. All such exposure
>    to substantially the same general conditions existing
>    at or emanating from one premises location shall be
>    deemed one occurrence.

Id. The policy defines "ultimate net loss" as "the total sum which the Assured ... become [sic] obligated to pay by reason of ... property damage ... as a consequence of any occurrence..." Id.

>    Endorsement No. 6 to the ICSOP policy provides:
>
>    Except with respect to the definitions of personal
>    injury and property damage and except with respect to
>    the exclusions contained in the attached umbrella
>    policy form, it is understood and agreed that
>    notwithstanding anything contained herein to the
>    contrary, it is hereby understood and agreed that
>    where underlying insurance is written under terms and
>    conditions providing greater protection or indemnity
>    to the assured than the terms and conditions of this
>    policy, this insurance shall indemnify the assured
>    upon the same terms, conditions and limitations of
>    the applicable underlying insurance, but where no
>    such underlying insurance exists this insurance
>    indemnifies the assured upon the terms, conditions
>    and limitations of the attached umbrella form, and/or
>    amendments or endorsements thereto.

Larson Declaration, Exhibit 2. Endorsement No. 7 to the ICSOP
policy provides:

> <u>Defense Endorsement</u>
> In consideration of the premium provided, it is
> understood and agreed that in the event there be no
> underlying insurance against loss or claim covered by
> this Policy, the company agrees to defend in his name
> and behalf any suit against the Assured alleging
> Personal Injury, including death at any time
> resulting therefrom, or property damage and seeking
> damages by reason of a contract under which the
> Assured assumed or is alleged to have assumed
> liability of others therefor, even if such suit is
> groundless, false or fraudulent; but the company
> shall have the right to make such investigation,
> negotiation and settlement of any such claim or suit
> as may be deemed expedient by the Company.

<u>Id.</u>

## Standards

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c).

## Discussion

### 1.  <u>Motions for partial summary judgment</u>

The insurers assert that PCC constructed and operated the
pretreatment system to prevent ongoing discharges of thorium from
the Titanium Plant, and thereby to allow PCC to continue its

manufacturing operations. They also challenge PCC's assertion that the insurers are obligated to pay for the costs of the pretreatment system because the costs were incurred "because of" or "on account of" property damage. The insurers argue that the pretreatment system was intended to prevent future thorium contamination of the City sewers, not to clean up extant contamination. See, e.g., <u>Aerojet-General Corp. v. San Mateo County Superior Court</u>, 211 Cal. App. 3d 216 (1989), holding that while "legally compelled expenses for the cleanup of extant pollution" constitute damages, expenditures to "prevent future pollution ... which has not yet occurred" do not); <u>Schnitzer Investment Corp. v. Certain Underwriters at Lloyd's of London</u>, 341 Or. 128 (2006)("defendants' policies define 'property damage' as an injury that occurs during the policy period, not an injury that may occur in the future").

PCC counters that the installation of the pretreatment system at the Titanium Facility was required because of historical damage to the City sewer and the need to mitigate further damage to the City sewer from thorium.

The evidence presented on this motion establishes the following. First, that the thorium oxide was found in three locations: PCC's Steel Facility, (from which contaminated equipment was moved to the Titanium Facility in 1982); PCC's Titanium Facility; and the City's sewers. Second, that only the

thorium oxide in the City sewers constitutes "property damage" under the policies at issue in this case. Thorium oxide contamination that exists within PCC's premises cannot constitute damage to the property of a third party. Third, that the only route by which thorium produced by PCC's operations could appear in the City sewers is through the sumps and their drains at PCC's facilities and out into the sewers. This was the known and intended pathway for dispersal of the thorium oxide. The question to be determined is whether the pretreatment system was intended to "remediate" or repair existing property damage to the City sewers from this thorium or, rather, whether its purpose was to prevent future contamination, originating at PCC, from traveling this route to the City sewers. I find no evidence that the pretreatment system was intended to repair existing property damage to City sewers. Rather, PCC's evidence uniformly indicates that the pretreatment system was intended to prevent future contamination of the sewers from PCC's operations, whether with or without the use of thorium oxide.

PCC's witness David Murray states in his Declaration that PCC agreed through the Consent Agreement to clean up City sewer lines where the radioactivity level exceeded 20 pico-Curies per gram, which was "much more feasible than cleaning every part of the entire sewer to background." Murray Declaration ¶ 13. In addition to cleaning the City sewer, the Consent Agreement also

required PCC to install a pretreatment system to "eliminate _further_ migration of thorium from the Titanium Facility and damage to the City sewer." Id. at ¶ 17 (emphasis added).

PCC's witness Martha Diblee states in her declaration that upon learning that thorium had accumulated in the City sewer, OHD and the City met with PCC to "prevent _further_ discharges of thorium from PCC and make plans to clean the sewer." Diblee Declaration ¶ 8. PCC's expert witness Gaynor Dawson states in his declaration that "legacy wastes in the PCC sewers from the Titanium Plant _would have_ continued to be released into the Portland City sewer lines _had they not been intercepted and removed by the pretreatment system_." Dawson Declaration ¶ 13 (emphasis added).

By way of further explanation, Murray states that in 1995, PCC evaluated the cost to eliminate the discharge of thorium from all sources at PCC, and determined that doing so would exceed $14 million. Murray Declaration at ¶ 18. Accordingly, PCC found it more cost effective to "continue diverting plant effluent to a pretreatment system so that _no further_ third party property damage occurred as a result of the migration of thorium." Id. (Emphasis added).[1]

---

[1] But in ¶ 19 of his Declaration, Mr. Murray contradicts himself, stating that "[i]f PCC did not suppress the migration of thorium, it would have continued to cause further damage ... and the cleaning efforts in the City sewer would have been futile." In fact, according to ¶ 18, PCC also had the option of decontaminating

PCC's witness Gaynor Dawson gave similar testimony, stating that when the contamination problem in the sewers was discovered, PCC had "alternatives for mitigation," the two most likely candidates being to 1) remove all contaminated pipes, equipment and other sources of thorium, then cleaning or replacing everything to "prevent any further migration of thorium within the system" or 2) intercept the flow of thorium, remove it from the water, and dispose of it. Dawson Declaration ¶ 15. Dawson states that the estimated cost of the first option was more than $14 million, while the second alternative cost less. Id. at ¶ 17. Dawson describes the second alternative, the pretreatment system, as "analogous to a traditional pump and treat remedy," which involves "wait[ing] for the contaminants to be released and migrate to the collection point." Id. (Emphasis added.)

Although Dawson states the opinion that the pretreatment system installed at PCC is "a component in the remediation of the city sewer," he explains that this is "because it controls the source of thorium migration." Id. at ¶ 21. (Emphasis added) Dawson's testimony does not suggest that the pretreatment system cleans up or remediates existing contamination in the sewers

---

its premises and discontinuing thorium operations. This suggests that had PCC known in 1970 that thorium would accumulate in the City's sewers, it could have installed a pretreatment system at that time. Obviously, had PCC done so, it could not have made a claim on its insurers for the costs of that pretreatment system.

except insofar as it prevents future contamination from arriving there.

Similarly, although Diblee states in her Declaration that the pretreatment system "allowed remediation of the City sewer," Diblee Declaration ¶ 10, there is no evidence in the record that this is the case, again except to the extent that the pretreatment system prevented future migration of thorium into the City sewer.

Indeed, at oral argument on the motion the court asked if any material from the sewer system was rerouted through the effluent pretreatment system to clean up the thorium oxide contamination there. Counsel for plaintiff responded that this never occurred. Transcript 48:7-10, attached to the Declaration of Carl E. Forsberg.

The evidence proffered by PCC does not support PCC's contention that the pretreatment system was necessary to clean up existing contamination in the City sewers; rather, it shows only that the pretreatment system was installed to prevent future contamination from continuing the accumulation of thorium in the sewer. I therefore conclude that the only historical thorium contamination being mitigated by the pretreatment system was thorium that was being treated on site at PCC, not in the City's sewers. While thorium contamination on site at PCC had the potential to cause third party property damage, so long as it was

15  - FINDINGS AND RECOMMENDATION

contained within PCC and collected before it left PCC's premises, it did not constitute third party property damage.[2]

Because the present motion addresses only the insurers' indemnity obligation, the grant of summary judgment to the insurers does not determine any issue with respect to the insurers' duty to defend. I note that Daniel Larsen states in his Declaration that in its identification of defense and indemnity expenses in this case, "PCC has characterized the bulk of pretreatment system costs as serving both defense and indemnity purposes." Larsen Declaration ¶ 3. Since the pending motion for partial summary judgment is not directed at PCC's defense costs, and PCC has represented to the court that the operation costs of the pretreatment system are included in its defenses costs, this decision does not preclude PCC from making its best efforts to support a claim for pretreatment system costs as part of the insurers' obligation to pay its defense costs.

    2.   PCC's Objections to Evidence Proffered by Hartford

PCC objects to every exhibit submitted as part of the Albertson Declaration, except for Exhibits 12 (deposition excerpts), Exhibit 13 (Consent Agreement) and Exhibit 23

_____

[2] The Declaration of PCC counsel Daniel Larsen states that although the effluent pretreatment system continues to operate, PCC is not seeking to recover current operation costs, but rather costs from 1991 through 1999. Larsen Declaration ¶ 2. This suggests that the pretreatment system is not used solely to prevent the discharge of thorium.

(excerpts of Hartford's policies), arguing that the exhibits are not properly authenticated because Albertson is neither the author nor the custodian of the documents.

Under Rule 56(e), documents are admissible only if authenticated by and attached to an affidavit, and the affiant is the person through whom exhibits could be admitted. See also Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002)(trial court can only consider admissible evidence in ruling on a motion for summary judgment; authentication is a condition precedent to admissibility). Authentication is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." FRE 901(a). A proper foundation need not be established through personal knowledge but can rest on any manner permitted by FRE 901(b) or 902. Orr at 773. See also FRE 901(b)(providing ten approaches to authentication); FRE 902 (self-authenticating documents need no extrinsic foundation).

The insurers respond that all of the objected-to documents were produced by PCC in response to the defendants' discovery requests. The insurers note that Rule 56(e) permits the court to consider an attorney's declaration which attaches true and correct copies of documents when those documents were produced by the opposing party, or the documents are on letterhead associated with the opposing party. Maljack Productions v. Goodtimes Home Video Corp., 81 F.3d 881, 889 n. 12 (9th Cir. 1996). See also

17  - FINDINGS AND RECOMMENDATION

Hutchens v. Hutchens-Collins, 2006 WL 3490999 (D. Or. 2006) at *2-4. Moreover, the insurers argue, several of the exhibits described in the Albertson Declaration were identified, authenticated, or adopted by PCC's witnesses in deposition testimony, see Supplemental Declaration of Charles Albertson at ¶¶ 1-7, and PCC did not at that time object to the authenticity of any of the proffered documents.

PCC's objections are overruled.

## Conclusion

I recommend that defendant Hartford's motion for partial summary judgment (doc. # 66), joined in by defendant Insurance Company of the State of Pennsylvania, (doc. # 72) be GRANTED.

## Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due August 6, 2007. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due August 20, 2007 and the court's review of the Findings and

///

///

///

///

18  - FINDINGS AND RECOMMENDATION

Recommendation will go under advisement with the District Judge
on that date.

     DATED this 20th day of July, 2007.


                      /s/    Dennis James Hubel

                           Dennis James Hubel
                   United States Magistrate Judge