IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| PRECISION CASTPARTS CORP., an Oregon corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Case No. 04-1699-KI |
| vs. | ) ) | OPINION AND ORDER |
| HARTFORD ACCIDENT AND INDEMNITY COMPANY, a Connecticut corporation; ACE FIRE UNDERWRITERS INSURANCE COMPANY, a Pennsylvania corporation, formerly known as AETNA FIRE UNDERWRITERS INSURANCE COMPANY; CENTURY INDEMNITY COMPANY, a Texas corporation, and THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, a Pennsylvania corporation, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendant. | ) ) ) | |

Frank V. Langfitt
Daniel P. Larsen
Ater Wynne, LLP
222 S. W. Columbia, Suite 1800
Portland, Oregon  97201

Page 1 - OPINION AND ORDER

Scott P. DeVries
Winston & Strawn, LLP
101 California Street, Suite 3900
San Francisco, California  94111

    Attorneys for Plaintiff

William G. Earle
Davis Rothwell Earle & Xochihua, P.C.
1900 Wells Fargo Center
1300 S. W. Fifth Avenue
Portland, Oregon  97201-5604

Misty A. Edmundson
R. Lind Stapley
Soha & Lang, P. S.
701 Fifth Avenue, Suite 2400
Seattle, Washington  98104

    Attorneys for Defendants ACE Fire Underwriters Insurance Company, fka
        Aetna Fire Underwriters Insurance Company and Century Indemnity
        Company

Francis Douglas Tuffley
Helen A. Boyer
Thomas M. Jones
Cozen O'Connor
1201 Third Avenue, Suite 5200
Seattle, Washington  98101-3071

    Attorneys for Insurance Company of the State of Pennsylvania


KING, Judge:

This is an action by Precision Castparts Corporation ("PCC") against its liability insurers to recover defense and indemnity costs associated with releases of thorium oxide into the sewers of the City of Portland and PCC's investigation and remediation efforts.  On July 14, 2007, I granted partial summary judgment and dismissed PCC's pretreatment system indemnification claim alleged against ACE Fire Underwriters Insurance Company ("ACE") and Century

Page 2 - OPINION AND ORDER

Indemnity Company ("Century"), based on the analysis by the Honorable Dennis J. Hubel in the

Findings and Recommendation filed on July 20, 2007. I adopted Judge Hubel's conclusion:

> The evidence proffered by PCC does not support PCC's contention that
> the pretreatment system was necessary to clean up existing contamination in the
> City sewers; rather, it shows only that the pretreatment system was installed to
> prevent future contamination from continuing the accumulation of thorium in the
> sewer. I therefore conclude that the only historical thorium contamination being
> mitigated by the pretreatment system was thorium that was being treated <u>on site</u> at
> PCC, not in the City's sewers. While thorium contamination on site at PCC had
> the potential to cause third party property damage, so long as it was contained
> within PCC and collected before it left PCC's premises, it did not constitute third
> party property damage.

<u>Precision Castparts Corp. v. Hartford Accident and Indemnity Company</u>, Civ. No. 04-1699-KI,

2007 WL 2590438, at *7 (D. Or. Aug. 27, 2007). That decision left pending PCC's claims for

breach of contract on the duty to defend and breach of contract on the duty to indemnify

concerning failure to indemnify PCC for cleaning up thorium oxide that had accumulated in the

Portland city sewers.

ACE and Century (collectively, the "Insurers") seek full summary judgment dismissing

PCC's claimed damages arising from the expected discharge or release of thorium into the City

of Portland's ("City") sewer system. Alternatively, the insurers seek partial summary judgment:

(1) dismissing PCC's alleged defense costs incurred prior to notifying ACE or Century of a claim

in February 1997; (2) dismissing PCC's claimed damages associated with its own property;

(3) dismissing PCC's claimed damages associated with alleged property damage that occurred

outside the ACE and Century policy periods; and (4) finding that the "prior Excess Insurance and

Non-accumulation of Liability" clause of the Century policy reduces the limits of liability of that

policy by any amounts due to PCC on account of loss under any prior excess insurance. Before

the court is Defendants Ace Fire Underwriters Insurance Company and Century Indemnity

Company's Motions for Summary Judgment (#192). For the reasons below, I conclude that the pollution exclusion precludes coverage and dismiss all remaining claims.

## FACTS

PCC manufactured airplane engine parts and airframe components. In the early 1970s, PCC developed an investment casting process for titanium parts that used thorium oxide, a low-level radioactive material regulated by the Nuclear Regulatory Commission through the Oregon Health Division ("OHD"). Thorium and thorium oxide are listed by the United States government as hazardous material and hazardous substance and were regulated as a pollutant by the City in PCC's post-1990 wastewater discharge permits.

From 1970 to 1992, PCC used thorium oxide in two buildings at its facility for investment casting. It discharged thorium oxide as a waste material into PCC's on-site sumps and sewers and then onto the City sewer system. PCC had licenses from OHD during this period to possess and use thorium. According to PCC, the known and intended pathway for thorium was the wide dispersal of thorium within the contents of the City sewer and attendant dilution to acceptable levels, as opposed to its release into biofilms along the City sewer walls and in sediments. The biofilms consist of living organisms that form fibrous mats and are capable of ingesting or absorbing and concentrating inorganic matter within their structure. The biofilms absorbed or filtered the thorium particles.

A comprehensive survey done by PCC, the City, and OHD showed that PCC's industrial effluent containing thorium oxide had accumulated through the City sewer system, as well as within PCC's facilities. PCC began clean-up of thorium in 1989. Discussions by PCC, OHD,

and the City concerning thorium issues resulted in the execution of a Consent Agreement on

July 13, 1990.

ACE issued primary insurance policies to PCC covering May 1, 1979 through May 1,

1983.  Century issued an excess policy to PCC covering May 1, 1983 to May 1, 1984.  PCC sent

a notice of claim with respect to thorium contamination to Century and ACE on February 12,

1997 and requested a defense and indemnity for the claim.

The ACE policies contain the following term:

> The Company will pay on behalf of the **insured** all sums which the
> **insured** shall become legally obligated to pay as damages because of
>
> A. **bodily injury** or
>
> B. **property damage**
>
> to which this insurance applies, caused by an **occurrence** and the company
> shall have the right and duty to defend any suit against the insured seeking
> damages on account of such **bodily injury** or property damage, even if any of the
> allegations of the suit are groundless, false or fraudulent, and may make such
> investigation and settlement of any claim or suit as it deems expedient.

Edmundson Decl. Ex. 51 at POLICY0004.

"Occurrence" is defined in the ACE policies as "an accident, including continuous or

repeated exposure to conditions, which results in **bodily injury** or **property damage** neither

expected nor intended from the standpoint of the **insured**."  Id. at POLICY0005.

The ACE policies contain the following exclusions:

> This insurance does not apply:
>
> (f)  to bodily injury or property damage arising out of the discharge,
> dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic
> chemicals, liquids or gases, waste materials or other irritants, contaminants or
> pollutants into or upon land, the atmosphere or any water course or body of water;

but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

Id. at POLICY0004.

The Century policy has the following terms:

    1.  COVERAGE.  The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of liability

    (a)  imposed on the insured by law, or

    (b)  assumed under contract or agreement by the Named Insured and/or any officer, director, stockholder, partner or employee of the Named Insured, while acting in his capacity as such,

    for damages, direct or consequential, and expenses, all as more fully defined by the term "ultimate net loss" on account of:

    (1)  personal injury, (2) property damage, (3) advertising liability,

    caused by or arising out of an occurrence, occurring anywhere in the world.

    ULTIMATE NET LOSS.  The term "ultimate net loss" means the total sum which the Insured, or any company as his insurer, or both, become obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and . . . all sums paid . . . as a consequence of any occurrence covered hereunder, excluding only the salaries of the Insured's or of any underlying insurer's permanent employees.

Edmundson Decl. Ex. 52 at PCC0023355.

The Century policy contains an absolute pollution exclusion, "except insofar as coverage is available to the Insured in the underlying insurances."  Id. at PCC0023366.  The "underlying insurance" contains a "sudden and accidental" pollution exclusion identical to the exclusion in the ACE primary policies, quoted above.

Page 6 - OPINION AND ORDER

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

The Insurers contend that pollution exclusions like the one at issue here preclude coverage for alleged property damage when the discharge of wastes or pollutants into a sewer system was expected or intended, regardless of whether any resulting damage was intended. According to the Insurers, PCC expected to discharge thorium into the City's sewers and did so only by design and through the known and intended pathway for dispersal. Because the policies exclude coverage for expected discharges of pollutants or contaminants, the Insurers argue that there is no coverage for the thorium discharges into the City's sewers. The Insurers contend that the nature of the resulting property damage, and whether it was intended or not, is not relevant to a coverage determination because there is no coverage if the property damage arises out of the discharge of a pollutant.

PCC argues that the insurers focus on the wrong release, namely the initial release into the sewer. According to PCC, thorium was also released a second time, into the biofilms that

coat the sewer pipes, and that this release was sudden and accidental. PCC claims that its

situation is analogous to the releases in St. Paul Fire & Marine Ins. Co., Inc. v. McCormick &

Baxter Creosoting Co., 324 Or. 184, 923 P.2.d 1200 (1996), and Employers Ins. of Wausau v.

Tektronix, 211 Or. App. 485, 156 P.3d 105 (2007). According to PCC:

> PCC neither intended nor expected the release of thorium from the sewage
> material into the sewer biofilm to cause damage. The insureds in McCormick &
> Baxter and Tektronix disposed of waste into a unit anticipating that natural forces
> would dissipate the waste rendering it harmless. Similarly, PCC disposed of
> waste into a unit anticipating that natural forces would disperse and dissipate the
> thorium; specifically it was PCC's intention that the thorium-laden sewage
> material would be dispersed widely and diluted by several thousands of gallons of
> sewage per minute in the City sewer such that no contamination would result.

Pl.'s Resp. in Opp'n to Mots. for Summ. J. of Ace Fire and Century Indemnity at 12. PCC

contends that a jury should resolve whether coverage exists for the damage caused by the

unintended and unexpected dispersal of thorium.

The insurers characterize PCC's argument as asking the court to negate both the pollution

exclusion and McCormick & Baxter so that the pollution exclusion only precludes coverage for

expected or intended property damage. The insurers argue that this is incorrect because the

pollution exclusion looks to the expected dispersal of contaminants, not expected contamination.

Concerning the biofilm argument, the insurers note that the concept of a secondary discharge is

not found in the cases cited by PCC and contradicts the "arising out of" language in the pollution

exclusion. PCC argues that there is not even a secondary discharge because the initial discharge

went directly into third-party property–the City sewer.

McCormick & Baxter analyzed a pollution exclusion which is identical to the one at issue

here. It first stated that "if a 'discharge, dispersal, release or escape' is 'sudden and accidental,'

the resulting property damage need not be 'sudden and accidental' for the exception to the

exclusion to apply and for coverage to exist." McCormick & Baxter, 324 Or. at 212. This
holding undermines PCC's argument that it did not intend or expect the release of thorium from
the sewage material into the sewer biofilm to cause damage. The issue is whether the release was
sudden and accidental, not whether the damage was sudden and accidental.

McCormick & Baxter continued by determining that the phrase "sudden and accidental"
is ambiguous and must be construed against the drafter. Id. at 212-216. The court held that the
pollution exclusion provides that the policy does not apply "to discharges, dispersals, releases, or
escapes that are 'unintended and unexpected.'" Id. at 216.

Applying the facts to this interpretation, McCormick & Baxter states:

> M&B presented evidence that contaminants from the surface
> impoundments leached into the groundwater and subsurface soil during the
> effective periods of the pertinent policies. M&B presented additional evidence
> that leaks, ruptures, and spills at the plant occurred during that time and that those
> events also affected the groundwater and subsurface soils. M&B presented
> evidence that the contamination that resulted from those events–the discharge,
> dispersal, release or escape of the contaminants–was unexpected and unintended.
>
> The trial court erred when it granted summary judgment in favor of [the
> insurers] on the "pollution-exclusion" issue.

Id. Surface impoundments were uncovered pits used to store waste water containing
contaminants. At the time, the use of surface impoundments was standard in the wood treatment
industry. "They were believed to hold the waste and to permit liquids to evaporate over time."
Id. at 190. Instead of evaporating, the "contaminants placed in the surface impoundments
leached through layers of soil into the subsurface soil and groundwater." Id.

The situation in McCormick & Baxter is very different from the one before me because
the waste disposal described in the case differs from PCC's waste disposal methods. M&B
intentionally put the waste water into the surface impoundments and expected it to stay there

Page 9 - OPINION AND ORDER

until it evaporated.  M&B did not expect or intend for the waste water to leach into the subsurface soil and groundwater.

In contrast, PCC fully intended to put get rid of the thorium by washing it down the city sewer.  PCC obtained permits to do so.  Although PCC expected the thorium to disperse throughout the sewer system, and not to attach to the biofilms, the biofilms are within the sewer system.  Thus, the thorium did not leave the sewer.  The waste water in McCormick & Baxter left the surface impoundments and traveled into the subsurface soil and groundwater.  The two situations are not alike.  PCC's situation would only fit the facts in McCormick & Baxter if the thorium left the sewer system and entered the soil or groundwater, possibly through a crack in the sewer pipe.  There is no evidence that occurred.  PCC is trying to recover costs for cleaning the interior of the sewers.

PCC does not fare any better under Tektronix, which, just like McCormick & Baxter considered coverage for contaminants leaching out of surface impoundments into the soil and groundwater, in addition to some spills.  Tektronix, 211 Or. App. at 490.

I conclude that PCC's discharge of thorium into the city sewer was expected and intended and thus not sudden and accidental.  Consequently, the pollution exclusion applies and there is no coverage, no duty to defend, and no duty to indemnify.

I decline to address the motions for partial summary judgment.

///


///

**CONCLUSION**

Defendants Ace Fire Underwriters Insurance Company and Century Indemnity

Company's Motions for Summary Judgment (#192) is granted.  This action is dismissed with

prejudice.

IT IS SO ORDERED.

Dated this _____12th_____ day of June, 2008.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge